SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

DREXEL BURNHAM LAMBERT IN-
CORPORATED; Drexel Burnham Lam-
bert Group Incorporated; Michael R.
Milken; Lowell J. Milken; Cary J.
Maultasch; Pamela R. Monzert; Victor
Posner; Steven N. Posner; and Pennsyl-
vania Engineering Corporation, Defen-
dants.

No. 88 Civ. 6209 (MP).

United States District Court,
S.D. New York.

Dec. 1, 1993.

As Corrected Dec. 2, 1993.

Barry R. Goldsmith, Leo R. Orenstein, Ellen B. Cohn, Christopher Bruno, S.E.C., Washington, DC, for plaintiff SEC.

Dennis J. Block, Greg A. Danilow, Weil Gotshal & Manges, Martin Rosen, Lawrence A. Blatte, Rosen & Reade, New York City, Stuart Gordon, Metzger, Hollis, Gordon & Mortimer, Washington, DC, for defendants Victor Posner and Steven Posner.

## OPINION AND FINDINGS (IN PART)

MILTON POLLACK, Senior District Judge.

This suit involves a subsidiary chapter to be completed in relation to well documented legal history of the scandalous conduct of Drexel Burnham and Michael Milken in the 1980's. This chapter is part of the larger story and deals with the oft-enjoined predatory conduct of Victor Posner, his son Steven Posner and their controlled corporation Pennsylvania Engineering Corp. ("PEC"), until the latter's bankruptcy in 1992.

This suit was commenced in 1988 following the revelations of Ivan Boesky in 1986 and 1987, which landed him in jail in 1987. The claims against the defendants Posner and PEC marked time while the SEC was busy clearing up the claims against the other defendants named herein. Those others included Drexel, Michael Milken, Lowell Milken, Carey Maultasch and Pamela Monzert, all of whom ultimately were cast in judgment and permanently enjoined from violating the United States Securities and Exchange Act and the Securities Act. Additionally, Drexel was required to disgorge the sum of $350

million and Michael Milken disgorged the sum of $400 million.

This left only the Posners and PEC to be dealt with in this litigation. During attention to those defendants, the SEC had vainly in a five-year period sought depositions and production of records from the Posners and PEC, only to be rebuffed with refusals based upon the Fifth Amendment privilege against giving testimonial data. Just before trial, the Posners in a grandiose gesture, announced that they would be prepared to testify at trial. Their refusal to participate in discovery proceedings before trial entitled and obtained for the SEC an order of preclusion against the Posners from testifying at trial; having denied an opportunity to SEC to depose and obtain discovery before trial, the SEC was entitled to an order depriving the Posners of a trial opportunity belatedly to come in with a version of their concealed story that had not been pre-tested.

Nonetheless, efforts to wind up the complicity of those defendants by consent procedures were extended before trial, but did not bear fruit. The trial commenced and was completed in June, 1993. The trial was highlighted with the testimony of the witness, Ivan Boesky, called by the SEC and with the witness, Michael Milken (hereafter "Milken"), called by the Posners to the stand.

The case charged the Posners and PEC with a host of violations of reporting, record keeping and the anti-fraud provisions of the U.S. Securities Laws and the Rules promulgated thereunder. The violations which are dealt with initially herein, occurred in the context of the Posners' efforts to gain control by illegal means of Fischbach Corporation, a listed company on the New York Stock Exchange. The incumbent management opposed the efforts of the Posners and the violations involved Ivan Boesky and his Organization which engaged in buying and parking voting stock of Fischbach for the benefit of the Posners, with the understanding that Boesky was at no risk of loss in the transactions and would recover his outlays and costs to carry.

This action represents the third time that the Posners have been sued by the SEC for engaging in violations of the Securities Laws.

The first two times they consented to the issuance of injunctions prohibiting them from engaging in future violations of various anti-fraud and reporting provisions of the Federal Securities Laws akin to those violations involved in this suit. Because prior injunctions had failed to prevent them from engaging in further like violations and because the Posners have used and abused public companies, of which they are (or were) officers and directors, as vehicles to engage in rapacious and violative conduct repeatedly, and to unjustly enrich themselves unconscionably at the expense of the public shareholders, the SEC therefore here seeks an injunction barring them in the future from further serving in the capacities of officers and directors of public companies registered with the SEC. This type of relief is sought pursuant to the recently enacted statutes, Sections 101 and 201 of the Remedies Act amending Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act, respectively, which provide express statutory authority for a federal court to bar or suspend individuals addicted to predatory and unprincipled conduct in respect of their management and control of public enterprises, from serving again as officers and directors in public companies registered with the Commission. The SEC also seeks an order requiring that these defendants shall disgorge the estimated amounts by which they were unjustly enriched in the processes in which they engaged at the expense of the public shareholders involved.

Inasmuch as the initial discussion of this case turns on the filing of a Schedule 13D with the SEC, it is well to pause to explain Schedule 13D.

The Federal Securities Laws require public disclosure of the accumulation of 5% or more of a class of voting securities of a public company by any individual, entity or group acting together. The purpose of this disclosure is to protect companies and the investing public by giving them notice of such accumulations because of their potential effect on control of the company or the price of the company's securities. Such disclosure must generally be made by filing a document known as a Schedule 13D with the SEC, no later than 10 business days following a 5%

accumulation. A copy of the Schedule 13D must be mailed to the company whose securities have been accumulated. The Schedule 13D must be promptly updated when there is a 1% change in the size of the accumulation or a material change in the information contained in the filed Schedule 13D.

## The Fischbach Transactions:

The prelude to the Fischbach transactions commenced in or about 1980, when the Posners and their dominated and controlled corporation, Pennsylvania Engineering Corporation ("PEC") started accumulating a sizable position in Fischbach. By March 20, 1980, PEC had filed a Schedule 13D with the SEC disclosing beneficial ownership of 10.53% of Fischbach's outstanding common voting stock. In August 1980, PEC and Fischbach entered into a so-called "Standstill Agreement" that PEC could not acquire more than 24.9% of Fischbach's outstanding voting securities unless a party not affiliated with PEC filed a Schedule 13D with the SEC indicating ownership of more than 10% of Fischbach's outstanding common stock, or made a filing pursuant to the Hart–Scott–Rodino Act ("H–S–R") indicating an intention to purchase over 10% of Fischbach's outstanding common stock.

In September 1981, PEC filed an amended Schedule 13D, disclosing that it owned 24.8% of Fischbach's outstanding common stock. In December 1982, the Posners and PEC agreed to extend the term of the Standstill Agreement for an additional 5 years. Victor Posner, shortly thereafter, made it clear to his house counsel that he intended to gain control of Fischbach and to break the Standstill Agreement and ultimately gain 100% ownership. The evidence plainly indicated existence of Posner's intention and of a conspiracy among Drexel, Milken and the Posners formed to accomplish a breach of the Standstill Agreement as a preliminary to further stock acquisitions by PEC.

Familiarity with the detailed findings of fact which accompany this opinion, will be assumed for purposes of the details spelling out the background and history of the transactions now to be discussed.

In or about 1980 certain shareholders of Fischbach (the "Fischbach shareholders"),

entered into an agreement (the "Standstill Agreement") with Fischbach. That agreement on one side involved the Posners and PEC, and on the other side, the Fischbach Corporation. It barred the Posners and PEC from acquiring more than a 24.9% interest in Fischbach. Under the terms of the Standstill Agreement however, the Fischbach shareholders were permitted to acquire more than a 24.9% interest in Fischbach if, among other things, a third-party (i) acquired more than 10% of the outstanding Fischbach voting securities, and (ii) reported such purchases to the SEC and Fischbach in a Schedule 13D filing.

Drexel, Milken and the Posners entered into a conspiracy to accomplish Posner's purpose of breaking the Standstill Agreement and acquiring control of Fischbach. To carry out the plan, it was necessary to enlist others in the conspiracy who would be willing to acquire more than 10% of Fischbach's outstanding voting stock and who would file a Schedule 13D announcing such acquisition. That would bring about the demise of the Standstill Agreement.

The first attempt in the plan was made through Executive Life Insurance Co., an insurance subsidiary of First Executive Corporation and its related companies who were important customers of Milken's High Yield Bond Department. In the latter part of 1983, Executive Life converted Fischbach convertible bonds which it owned to a 13% stake in Fischbach's common stock. It thereupon filed a Schedule 13G, which was the appropriate schedule for an insurance company to file. However, it would take a Schedule 13D to break the Standstill Agreement which barred the Posners from acquiring additional Fischbach stock. Accordingly, sixteen days later, plainly in an effort to repair the situation, First Executive filed a Schedule 13D alleging the same facts that it had asserted in its Schedule 13G. It then apparently offered its block of common stock of Fischbach for purchase but the Posners did not have the wherewithal or the credit in the market which would enable it to finance the transaction, and in short order First Executive, in December, 1983 sold its entire block of Fischbach stock, 523,467 shares, at

$52 a share, the market price approximately, to Fischbach.

While this result seemingly was not what was contemplated by the Posners, the latter shortly took the position that the act of filing of the Schedule 13D by Executive Life was enough to break the Standstill Agreement under its terms, and that they intended to accumulate additional shares of Fischbach up to 49.9% of the total number of shares outstanding.

On April 24, 1984, PEC filed an action against Fischbach seeking a declaration that the Standstill Agreement was no longer in effect. Fischbach responded two days later with a lawsuit of its own in which it alleged that the Standstill Agreement was still in effect because Executive Life was an insurance company which had acquired Fischbach stock for investment purposes, and thus, was not required to file a Schedule 13D. Unquestionably, Milken knew of First Executive's ownership of Fischbach convertible securities. In the uncertainty surrounding the affect of Executive Life's Schedule 13D on the PEC–Fischbach Standstill Agreement, Milken called upon arbitrageur Ivan Boesky, and employing Wall Street argot, he encouraged Boesky to step in and buy enough of the outstanding stock of Fischbach, more than 10%, which would trigger the breach of the Standstill Agreement. Milken assured Boesky that he would not lose any money if he did. Boesky reasonably understood that he was being sought to do a "parking" job at Milken's request, and that if he took a position in Fischbach, he would be "stopped out", i.e., that he would be "made whole" if the stock went down before it was delivered to the source for which the parking had occurred. Unquestionably, Boesky also reasonably understood that the Posners were part of the arrangement. Milken told Boesky he would arrange to have Steven Posner call him to discuss the Fischbach transaction, self-evidently to vouch for the arrangement. Steven Posner promptly telephoned and discussed the matter with Boesky, reassuring Boesky that he had nothing to worry about. Boesky reasonably understood that Steven Posner was representing the Posner family interests and, on April 24, 1984, in conformity with the arrangement proceeded at a rapid pace to acquire a substantial interest in Fischbach stock.

During the period of Boesky's acquisition of Fischbach stock, Victor Posner was kept regularly informed by his senior in-house attorney, Edward Christenson, of the Boesky purchases of the Fischbach stock. Boesky periodically reported to Milken the status of the Fischbach investment that he was making, "where we stood in our accumulations". In these conversations with Boesky, Milken told Boesky that in his opinion "the more [Fischbach] stock you own, the higher price you would get." Boesky also occasionally spoke to Steven Posner about the purchases. Boesky continued to buy Fischbach stock and convertible debentures until he had purchased approximately 9.7% of Fischbach's outstanding common stock, at which time he stopped purchasing to make the required Hart–Scott–Rodino filing, seeking permission, which was granted, to purchase up to 15% of Fischbach's outstanding common stock. On June 29th, 1984 Boesky informed Milken of the green light obtained from H–S–R. Drexel also had been accumulating Fischbach stock which was added to the Boesky holdings, 145,000 shares, on July 9, 1984, thereby boosting his position above 10%. On July 10, 1984 Boesky filed the required amended Schedule 13D disclosing his ownership of 13.4% of the Fischbach stock. Christenson informed Victor Posner that a 13D had been filed by Boesky. Having bought in excess of the 10% he had been "engaged" to acquire, Boesky stopped buying Fischbach. Neither the original Schedule 13D filed by Boesky nor any of the amendments to it disclosed the arrangement between him, Milken and the Posners.

Fischbach concluded that Boesky's amended Schedule 13D filing relieved PEC of the restrictions under the Standstill Agreement and discontinued its declaratory relief action against PEC.

In July 1984, Drexel began the process of discussing financing for the Posners including the possibility of gaining total control of Fischbach. The team working on the project was led by Alan Brumberger in Drexel's New York office. Their analysis showed that

PEC's earnings were weak relative to the amount of money that would be needed and that it would be difficult to finance the transaction. Sometime during the ensuing period it developed that Brumberger's colleague Steven Weinroth, did not want to do business with the Posners altogether. Not only because they did not have strong credit, but because of their "controversial" reputation. In contrast Milken was in favor of proceeding. Milken prevailed.

The market price of Fischbach stock began to drop sharply in the latter half of 1984 and got as low as $32 per share and Boesky kept up a regular and repeated demand for a takeout from the parking arrangement. In response, Milken kept on assuring him that there was no need to worry and reminded him that he was guaranteed against loss. Boesky repeated his concerns to Steven Posner, who also kept on reassuring him not to worry. Ultimately, after considerable time had elapsed, and the market price for the stock showed only a modest recovery, Boesky conveyed his desire to be taken out of the investment by March 1, 1985; he told Steven Posner that this date marked an internal problem for him.

Arrangements were made by Drexel for a private placement to finance a takeover of the Boesky block without providing a clue to the parking deal and to meet a bank loan of PEC in connection with clearing up PEC's balance sheet for issuing its securities in the financing. A price for the block had to be set which could be published. Boesky's expenditures for the block were in the neighborhood of $52 per share but the stock was selling in the market at about $35 per share involving a loss of $6.5 million. Boesky and Milken sought to set a price which would not be too high in relation to the market price "so as to avoid making the transaction seem ridiculous". Victor Posner personally discussed with Milken among other things, the closing of the deal and the nominal price to be paid to Boesky and while Posner wanted to fix the price only a little bit above the market he agreed to set a price of $45 per share for the takeover. That price would reduce the loss to Boesky to approximately $2 million after crediting some gains realized

by him on some Fischbach convertible debentures and would be taken care of in another way. Unquestionably it was deemed better to disassociate the takeover price from Boesky's actual costs and leave it to Milken to arrange reimbursement to Boesky for the shortfall some other way. Boesky and Milken mutually arranged a transaction to be carried out over-the-counter in London at $45 a share, which was roughly $9 per share higher than the price of the stock prevailing on the New York Stock Exchange ("NYSE"). PEC thereby picked up only about $3.6 million of the loss on Boesky's investment. On the following day the Posners took over from Drexel, through a NYSE transaction, 85,000 additional shares which Drexel had accumulated, at the NYSE price prevailing of $39.625. The total number of shares which the Posners thus acquired at the time was 590,687; PEC's subsidiary was the purchaser in each transaction. This maneuvering left an unreimbursed loss to Boesky of about $2 million, which Milken and Drexel took care of in other ways later on to satisfy Boesky's reimbursement.

Drexel underwrote and sold in a private offering approximately $56 million in securities issued by PEC's subsidiary, Pennsylvania Acquisition Securities, to pay for the stock the Posners acquired from Boesky and Drexel and to pay off $18 million of PEC's debt to banks.

Drexel received $3 million from the Posners in compensation. While one of Posners' executive's told Steven Posner that he considered the compensation to be too high, it had Victor Posner's express approval.

### The Criminal Prosecutions

Boesky, Milken and Drexel were each charged with felonies growing out of the Fischbach transactions and each pleaded guilty to the charges.

Boesky was charged with conspiracy to violate the Securities laws by filing false and inadequate Schedule 13D's which failed to disclose the secret arrangements for parking the stock and to reimburse Boesky for any losses on the transactions, and for failing to disclose the connection to the Standstill Agreement. Boesky pleaded guilty as charged to the criminal conspiracy charged

in April, 1987. Included in the government's statement to the District Judge at the plea hearing, with which Boesky affirmatively agreed, was the charge that Boesky had been instructed by his co-conspirator to buy over 10% of the stock outstanding and was expected to file a 13D accordingly. The Information also asserted that arrangements were made for the Posner Group ultimately to buy Boesky's accumulation of stock through the London Stock Exchange after hours in an over-the-counter transaction at a price more than 20% above that prevailing in the American market, in a disguised attempt to make Boesky nearly whole on his costs.

Drexel was charged with felony on the Fischbach transactions in an Information referring to the Standstill Agreement and stating that Milken had caused Boesky to acquire more than 10% of the Fischbach stock for the benefit of the Posner Group, with the purpose to break the standstill arrangement, and have a 13D filed without disclosure of the guarantee against loss (the parking arrangement). Drexel pleaded guilty as charged to the six Count criminal Information. The government charged that Drexel was also accumulating Fischbach stock while working on a financing of the Posner Group and that its actions were with the purpose to aid in breaking the Standstill Agreement and enabling the Posner Group to acquire control of the company; and that Drexel through Milken had secretly reimbursed Boesky for his losses.

The authorized representative appearing at the Plea proceedings for Drexel, stated to the District Judge on its behalf that "based on the information available to it, Drexel is in no position to dispute the government charges".

Michael Milken was charged in six Counts with felonies, to all of which he pleaded guilty as charged in April 1990, as a co-conspirator and as an aider and abettor in unlawful Fischbach transactions undertaken for the undisclosed economic benefit of "Milken, Drexel and its customers". The Information charged that Milken had induced his co-conspirator Boesky to purchase and hold more than 10% of outstanding Fischbach stock with the assurance that Drexel

would make up any losses, if any; that on or about July 9, 1984, the Boesky Organization bought in excess of 3% of Fischbach stock from Drexel (which it had been accumulating), thereby increasing Boesky's holding to more than 13% and on July 10, 1984, Boesky filed an amended Schedule 13D which fraudulently concealed Drexel's interest in Boesky's purchases; that the purpose was to evade regulatory requirements and to fraudulently conceal the true situation with respect to the Boesky 13D filings.

Milken told the District Judge in the plea hearing in referring to the arrangement he had made with Boesky that, "I do not remember what I told him six years ago, but I indicated to him that he would not lose money" ... "I assured him that Drexel would make good on his losses. These assurances were not recorded in the books of Drexel and I did not expect that they would be reflected in any Schedule 13Ds filed by the Boesky Organization and in fact they were not".... Milken further stated: "The Boesky Organization began buying Fischbach securities and eventually bought over 10% of Fischbach including securities that had been owned by Drexel. Over the next months, he called me incessantly to complain that the price of the stock was dropping, that Drexel was responsible for his losses, that my comments to him were guarantees against loss, and that he expected us to make good. Thus, I assisted in the failure to file an accurate 13D. This was wrong and I accept responsibility for it. This is the basis for Count II, and is one of the overt acts in Count I". Milken also admitted that "in order to make up these losses, I caused Drexel to execute certain bond trades which resulted in profits to the Boesky organization".

**The Proof At Trial**

The trial before the Court fleshed out the Fishbach transactions in more detail through the testimony of Boesky and Milken, supplemented by testimony at trial and by depositions of others. It turned into a swearing contest on the Posner connection with Boesky credibly laying the facts bare and Milken carefully tip-toeing semantically and evasively away from revealing the Posner connection with and their responsibility for the

Fischbach illegalities. Only so much of the evidence need here be reviewed separately from the accompanying Supplemental Findings of Fact.

Briefly, Boesky's testimony was that Milken telephoned to him suggesting the purchase and parking of 10% of Fischbach stock and that he would be stopped out and made whole by the Posner group if the stock were to go down. Milken also told Boesky that if he should want any direct conversation with the Posners, that he would arrange to have Steven Posner call Boesky. That same afternoon, within a matter of hours, Steven phoned and talked to Boesky and guardedly acknowledged his awareness that Boesky was to buy the stock saying basically "don't worry about it." Boesky testified that he believed it was very reasonable for him to assume that he was speaking for the Posner Group. He added, "Steven was a known entity among the Wall Streeters." Steven Posner was the senior executive and vice chairman in New York in charge of the Posner companies. Boesky thereafter had additional conversations with Steven Posner. They talked about when it was reasonable to assume that Boesky would be able to sell the position accumulated and the general response was "not to be concerned." There were several conversations between the two during the course of the holding about the persistently declining market price of the stock, and in response to Boesky's statement "Gee, it's down quite a bit", Steven would say "Don't worry about it". Ultimately, Boesky communicated to Steven that he would like it to be done by a time certain; he mentioned March, 1985. Boesky wanted to clean up the transaction by then if possible. Steven Posner never denied or repudiated his connection with the transactions nor in any way suggested that it was not the Posners' problem.

Milken's testimony on direct examination was that he did not "recall" telling Victor or Steven Posner of his assurances to Boesky. He denied any agreement, understanding or arrangement with Victor or Steven Posner about his assurances; he denied arranging the telephone call by Steven to Boesky; "not that I recall", he also said.

On cross-examination, Milken admitted that Drexel served as banker for the Posners and had ultimately financed in a private placement the purchase of the Boesky block by Penn Engineering, the Posner entity; but he denied that the Posners were co-obligors to Boesky with him.

On the issue of Milken's credibility, Milken also testified as follows: He did not remember "exactly" what he told Boesky but admitted "initiating" the conversations with him; he did not encourage Boesky to buy a "specific" amount of Fischbach, although the criminal Information to which he pleaded guilty said that he unlawfully induced the Boesky Organization to buy and hold more than 10%; he did admit guaranteeing Boesky for his losses; he claimed that he first assured Boesky against loss at the time when Boesky's losses totaled $6.5 million because of the sharp drop in the market price; that Drexel would make good because of "the future relationship we hoped to have with his firm" was his alleged reason; he denied any participation as testified by Boesky, in fixing the nominal $45 price for Boesky's sale to PEC; he denied he originated or participated in the idea of going to the over-the-counter market in London to do the trade, and claimed he does not know why it was done there; in short he contradicted most of Boesky's testimony to the contrary. He admitted that the day after the Posners paid $45 a share, Drexel sold them 85,000 shares of Fischbach at $39+ a share through the New York Stock Exchange; and he admitted that Drexel took a $3 million fee for "investment banking" services from PEC, that was paid from the private placement to finance the purchase of Boesky's block of stock and to pay off a bank loan to PEC.

Milken's denials, lapses of recollection and responses were unworthy of belief, contradictory and internally inconsistent. His demeanor evidence and sparring with the examiner and the Court belied their credibility.

Herbert C. Griffin, a witness by deposition, had left a bank connection to join the Posner controlled companies where he served from 1979 until August 1986, laterally in the capacity of executive vice-president. He described Steven Posner's role as in charge of the New

York office and as Milken's main contact at the Posner affiliated companies; and that Steven conducted the senior level relations responsibilities of the office.

Griffin testified that during the fall of 1984 Milken was in conversation on a speaker-phone with Steven while Griffin was present in the office and that Milken told Steven that Victor Posner intended to buy Fischbach stock from Boesky, to which Steven replied, "We don't have the money to do it and we want to do it, so you guys have to raise the money for us to do that, if that's what we're going to do". Steven, according to Griffin was in favor of purchasing the stock from Boesky.

After the deal with Boesky was closed, Griffin told Steven that in his opinion, the price paid to Boesky for the block was too high, to which without explanation, Steven responded that "he thought it was appropriate".

Donald Glazer, a defendants' witness at the trial and by deposition, had joined the Posner companies in 1984 to do work on the needed financing for PEC to purchase Fischbach stock. In December 1984, he met with Alan Brumberger of Drexel in this connection. Initially he canvassed the suggestion of a financing that would allow Posners to make a tender offer for any and all of the stock up to 100% of the amount outstanding. Early on, however Glazer was told that this was not feasible and that Drexel would not be able to do that degree of financing for the Posners at that time and suggested that the Posners do just the Boesky block for the time being.

When Glazer relayed this information to Victor Posner he was told that Victor wanted a commitment by Drexel to go beyond the Boesky purchase in the financing plans. Victor wanted an assurance from Drexel that the latter would get financing to acquire up to 80% of Fischbach. A suggestion was explored that this goal could be reached in three separate financings: the first would be basically to buy the Boesky stock; the second would be to get the Posner ownership up to over 50%; and the third would be to get the remainder up to a minimum of 80%.

Glazer suggested that Victor himself should speak to Milken, that this might help. The next day, in Glazer's presence, Victor phoned Milken directly and spoke to him about this. Milken expressed a willingness to make the effort in three steps, but pressed Victor to close the pending Boesky purchase. When Victor got off the phone, he told Glazer to go ahead and buy the Boesky stock and that he would rely on Milken to do later financings up to 50% and then 80%.

In Glazer's testimony by deposition it appeared that during the week of the closing with Boesky, Posner's lawyer, Sy Hertz, discussed with Steve Freiden, Boesky's lawyer, the price to be paid to Boesky. Freiden took the position that they were not going to negotiate on price; the amount to be paid was what it would take to make Boesky whole, namely, cost to Boesky plus cost to carry the stock. Negotiations for a price, according to Glazer went on for a week but price was not resolved by counsel. Glazer testified that the final decision regarding the financing, the price set for the trade in London for the Boesky stock and Drexel's $3 million fee were made by Victor Posner. Although Glazer said, "I knew all of the essential details to get to the negotiations, close the transaction", but he professed not to have known at the time what price was agreed and paid, or to remember what the differential was between Boesky's cost, the market at the time and the price paid, or how many shares were involved in the block purchased, or why the transaction was shifted to the London market to be closed there. He did recall with some prodding that the New York market price was $38, 39 or 40. This blurred recollection on the part of the man most intimately involved was remarkable, to say the least, is not worthy of belief and is not credited.

In sum, Steven Posner was shown to have been in, from the start, on the deal arranged by Milken with Boesky. From the start, Victor kept a close watch through his house counsel on its development and surfaced to give his sanction for the closing of it in all pertinent aspects. Boesky's testimony substantially gave the credible version of the parking job he undertook.

The issues of credibility are resolved in favor of the plaintiff and against the defendants. There is enough affirmative proof from the witnesses, the documents, the corroborating circumstances and the probabilities on which to draw the reasonable inferences and conclusions in favor of the plaintiff that surmount the pallid semantic and almost ludicrous denials and contrived explanations of the defendants' witnesses.

**Additional**

The accompanying Supplemental Findings of Fact and Conclusions of Law collate the essential matters in respect of the issues and findings of fact set forth herein and sufficiently deal with the remaining issues decided by the Court in this case without need for a further explanation by an opinion thereon.

**SO ORDERED.**

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. THE DEFENDANTS

1. At all times relevant, defendant Victor Posner dominated the affairs of a number of interrelated public companies including Pennsylvania Engineering Corporation (PEC), Sharon Steel Corporation, and DWG Corporation. In each of those companies, he held the titles of chairman, president, and chief executive officer, and directly or indirectly owned a controlling interest in the company's stock. No significant acquisition or sale of assets could be effected by any of those companies without Victor Posner's approval. From the testimony of all the witnesses who testified at trial it was clear that, as one of them put it, "all important decisions had to be cleared by Victor Posner." The Posner companies' executive offices have for years been located in a converted apartment building in Miami Beach called Victorian Plaza which is owned by a Posner family trust.

2. This action represents the third time Victor Posner has been sued by the SEC for engaging in violations of the federal securities laws. The first two times, he consented to the issuance of injunctions prohibiting him from engaging in future violations of various reporting and antifraud provisions of the federal securities laws, including those he is alleged to have violated in this case. As is more fully described below, those cases arose out of alleged instances of self-dealing and personal indulgence at the expense of public shareholders and foreshadowed later legal battles involving the Posners.

3. Victor Posner's problems with the federal government have not been confined to violations of the securities laws. In 1982, he was charged in a ten-count felony tax fraud indictment with having taken inflated deductions for land he had donated to a local college. After the trial judge learned that a juror had read news stories about Posner during the trial and, on that basis, set aside the jury's verdict finding him guilty on all ten counts, Posner entered a plea of *nolo contendere* to one count of conspiracy, four counts of tax evasion and five counts of filing false federal income tax returns.

4. Defendant Steven Posner is Victor Posner's son. He was at all times relevant a director and vice chairman of a number of public companies including PEC, Sharon Steel, and DWG, and headed a New York office established to enable the Posners to develop and maintain relationships with commercial and investment bankers. Steven Posner has, like his father, also previously been enjoined from engaging in violations of the federal securities laws.

5. During the years preceding the events giving rise to this action, Victor and Steven Posner established a business relationship with defendant Michael Milken, the founder and head of the High Yield Bond Department of defendant Drexel Burnham Lambert Inc.[1] Between 1982 and 1985, Drexel raised at least $400 million in capital for the Posners through public offerings and private placements.

6. At all times relevant, Steven Posner had a business relationship with Ivan Boesky. Boesky knew Victor Posner, but it was Steven Posner who was Boesky's primary

---

1. All defendants other than Victor Posner, Steven Posner, and PEC settled before this case went to trial.

contact at the Posner organization. Boesky visited Steven Posner at his offices on a number of occasions and, from time to time, would discuss various merger and acquisition situations with him.

7. Defendant PEC was at all times relevant a publicly held Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Its securities were registered with the Commission pursuant to section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*. On February 4, 1992, PEC filed for protection under the federal bankruptcy code.

## II.  *THE FISCHBACH FRAUD*

### A.  *The Posners' Foothold in Fischbach*

8. In January 1980, PEC started accumulating a sizeable position in Fischbach Corporation, an electrical and mechanical contracting concern whose stock was then traded on the New York Stock Exchange. On March 20, 1980, PEC filed a Schedule 13D disclosing beneficial ownership of 10.53 percent of Fischbach's outstanding common stock.

9. In August 1980, PEC and Fischbach entered into a standstill agreement which provided that, for a period of five years, PEC would not acquire more than 24.9 percent of Fischbach's outstanding voting securities unless, among other things, a third party filed "a Schedule 13D under the Exchange Act relating to the acquisition of more than 10% of [those] Securities."

10. In September 1981, PEC filed an amended Schedule 13D disclosing ownership of 24.8 percent of Fischbach's outstanding common stock. In December 1982, Posner agreed to extend the term of the standstill agreement for an additional five years.

### B.  *The Executive Life Schedule 13G/13D*

11. At all times relevant, First Executive Corporation and related companies were important customers of Milken's High Yield Bond Department. The president, chairman, and chief executive officer of the First Executive companies was Fred Carr, who directed more than $10 billion dollars of securities trading to Milken and his firm. Drexel also helped underwrite hundreds of millions of dollars of securities for First Executive and its insurance subsidiary, Executive Life Insurance Co. Milken came to know Fred Carr in the mid–1970's and, during the time period relevant to this case, was in daily contact with him.

12. By the end of 1983, First Executive, through Executive Life, owned more than 10 percent of Fischbach. In a Schedule 13*G* filed on December 12, 1983, Executive Life disclosed its ownership of 14.41 percent of Fischbach's outstanding stock. Sixteen days after filing the Schedule 13G, Executive Life filed a Schedule 13*D* which recited essentially the same information as that disclosed in the Schedule 13G.

13. On April 19, 1984, PEC and Posner filed a Schedule 13D in which they asserted that the Executive Life Schedule 13D had relieved them of the restrictions imposed by the standstill agreement with Fischbach, and that they intended to accumulate additional shares of Fischbach up to 49.9 percent of the total number of shares outstanding. On April 24, 1984, PEC filed an action against Fischbach seeking a declaration that the standstill agreement was no longer in effect. Fischbach responded two days later with a lawsuit of its own in which it alleged that the standstill agreement was still in effect because Executive Life was an insurance company which had acquired Fischbach stock for investment purposes and thus was not required to file a Schedule 13D.

14. Milken knew of First Executive's purchases of Fischbach securities, all of which took place before, as described in the next section, Milken "encouraged" Boesky to buy Fischbach.

### C.  *Posner To Boesky:  "Don't Worry About It"*

15. In April 1984, knowing of the uncertainty surrounding the effect of the Executive Life Schedule 13D on the PEC–Fischbach standstill agreement, Milken called arbitrageur Ivan Boesky. Employing a shorthand dubbed "Wall Street-ese" by Boesky in his trial testimony, Milken "encouraged" Boesky to buy more than 10 percent of the outstanding stock of Fischbach and assured

Boesky he would not lose any money if he did. Boesky understood from what Milken told him that, if he took a position in Fischbach, he would be "stopped out," *i.e.,* that he would be "made whole" if the stock went down. Boesky also understood that the Posners were part of the arrangement. Milken told Boesky he would arrange to have Steven Posner call him to discuss Fischbach.

16. Boesky expressed some concern to Milken about how long he would have to hold the stock. In his risk arbitrage business, he did not customarily hold stock for long periods of time and he had previously taken a "Posner related" position in the stock of another company—which he identified in his trial testimony as Burnup & Sims—that he had ended up holding for "a long, long time." Nonetheless, at the conclusion of the conversation, it was understood that Steven Posner would call Boesky and that Boesky would "agree to basically begin the process of purchasing securities." Although Milken apparently did not indicate during the conversation why he was interceding on the Posners' behalf, Boesky knew of the existence and terms of the standstill and "by that time ... was quite aware of the fact that Mr. Milken represented many people in their transactions in various ways."

17. Several hours later, Steven Posner did, in fact, call Boesky, acknowledged his awareness of the arrangement to have Boesky buy Fischbach, and told Boesky, "[D]on't worry about it." At the time of this conversation, Steven Posner "was a known entity among the Wall Streeters," and Boesky understood him to be representing the Posner family interests. On April 26, 1984, in accordance with the arrangement worked out with Milken and Steven Posner, Boesky started buying Fischbach stock. As he did so, he was aware that his acquiring in excess of 10 percent would break the standstill between the Posners and Fischbach and thereby enable the Posners to add to their Fischbach position if they so desired.

18. After Boesky started buying Fischbach stock at the behest of Milken and the Posners, he would periodically advise Milken of "where we stood in our accumulation."

Boesky would also occasionally speak to Steven Posner about the purchases.

19. Edward Christensen, a senior in-house attorney in the Posner organization, periodically informed Victor Posner of Boesky's reported purchases of Fischbach stock. Victor Posner had told Christensen that he would like to see the standstill rendered moot so that he could increase his Fischbach holdings.

20. Boesky's progress in accumulating Fischbach stock was too slow for Milken, who expressed some urgency about Boesky's reaching the 10 percent level. With Milken's prodding, Boesky accelerated his purchases. As he accumulated what came to be a $21 million position, he relied on the credibility of Milken as agent and the Posners as principals that he would not lose money on the purchases.

21. On May 18, 1983, Boesky filed a Schedule 13D disclosing ownership of 8.2 percent of Fischbach's outstanding common stock. Thereafter he embarked on the process of obtaining Justice Department clearance under the Hart–Scott–Rodino Act to increase his holdings to more than 10 percent, an unusual step for Boesky who did not customarily accumulate more than 10 percent of any company's stock. He received the clearance on June 29, 1984, informed Milken of that fact, and on July 9, 1984, acquired a block of 145,000 shares of Fischbach from Drexel, thereby boosting his position above 10 percent. The following day, July 10, 1984, he filed an amended Schedule 13D disclosing his ownership of 13.4 percent of the outstanding stock of Fischbach. Having bought in excess of the 10 percent he had been "encouraged" to acquire, Boesky stopped buying Fischbach. Neither the original Schedule 13D filed by Boesky on Fischbach nor any of the amendments to it disclosed the arrangement between him and Milken and the Posners.

22. Fischbach concluded that Boesky's amended 13D filing relieved PEC of the restrictions under the standstill agreement and discontinued its declaratory relief action against PEC.

### D. *Boesky Gets "Stopped Out" in London in part*

23. Shortly after Boesky crossed the 10 percent threshold, the price of Fischbach started to decline precipitously. By the end of 1984, the price of the stock had dropped to $32.50 per share, more than $19.50 lower than the average price Boesky had paid for it. Boesky's paper loss on his block of 408,-400 shares of Fischbach was roughly $8 million. During this period, Steven Posner and Milken continued to reassure him that he should not be concerned about suffering any losses on his Fischbach position.

24. Meanwhile, in July 1984, Drexel began the process of arranging financing for the Posners to gain control of Fischbach. The team working on the project was led by Alan Brumberger, an investment banker in Drexel's headquarters office in New York. Their analysis showed that PEC's earnings were weak relative to the amount of money that would be needed and that it would be difficult to finance the transaction. Brumberger's colleague Steven Weinroth did not want to do business with the Posners altogether, not only because they did not have strong credit but because of their "controversial" reputation. In contrast, Milken was in favor of proceeding with the transaction. Milken prevailed.

25. Boesky's fiscal year ended on February 28, 1985, and he communicated to Steven Posner a desire to "clean up" the Fischbach transaction by that date. Victor Posner knew of Boesky's desire in this regard.[2] On February 27, 1985, with Drexel acting as financial adviser, a subsidiary of PEC issued two classes of debt securities in a private placement, proceeds from which were used by the Posners to buy Boesky's Fischbach block. Drexel received a fee of $3 million for its services, the payment of which was authorized by Victor Posner.

26. The scheme was consummated on February 28, 1985, in London over-the-counter. The transaction was effected at $45 per share, roughly $9 higher than that day's close on the New York Stock Exchange. PEC consequently paid a premium of approximately $3.6 million above market on Boesky's block of 408,400 shares. The price was negotiated by Boesky and Milken. Their goal, as Boesky described it at trial, "was to get as high as you could go without looking ridiculous."[3] Thereafter the Posners continued to buy Fischbach and eventually acquired control of the company. The scheme had succeeded.

27. Donald Glazer, formerly executive vice president and chief operating officer of the Posner companies and the main Posner negotiator in the Fischbach transaction, testified in response to the Court's questions that he did not know anything about why the purchase of Boesky's Fischbach shares took place on the London Stock Exchange or how the trade was arranged.

28. The above-market price the Posners paid for Boesky's stock covered a substantial part of Boesky's loss on the position. The balance was covered as part of a reconciliation of accounts between Boesky and Milken.

### E. *The Fall–Out from Fischbach*

29. In April 1987, Boesky pled guilty to a criminal information charging him with making false and fraudulent statements in the Schedules 13D and amendments thereto he filed relating to Fischbach. Boesky was sentenced to three years in jail.

30. In September 1989, Drexel pled guilty to a six-count criminal information, including fraud in the sale of securities in connection with PEC's takeover of Fischbach, in violation of section 10(b) of the Exchange Act and Rule 10b–5 thereunder.

31. In April 1990, Milken pled guilty to a six-count criminal information. Count two of the information alleged that Milken "unlaw-

---

2. Donald Glazer, formerly of the Posner organization and now a $400,000 per year consultant for them, testified at trial that he had "no fear" that, if the Posners closed before March 1, 1985, "we could have the block." [Glazer 325.]

3. On March 1, one day after buying Boesky's shares on the London Stock Exchange, the Posners bought 85,000 shares of Fischbach from Drexel. The trade took place on the New York Stock Exchange at market ($39.625 per share). [Agreed Findings no. 70; ex. 99 (NYSE Stock Price Record).]

fully induced the Boesky Organization to buy and hold more than 10% of the outstanding Fischbach equity securities" in violation of section 13(d) of the Exchange Act and Rule 13d thereunder. In his allocution, Milken admitted that he had "encouraged" Boesky to buy Fischbach and that, although he could not remember "exactly" what he had told Boesky, he had "indicated to him that he would not lose money." Milken also admitted giving Boesky assurances that Drexel would "make good on his losses."

### F. *Milken's Credibility*

32. In his trial testimony, Milken contradicted Boesky on a number of key points. Boesky testified in effect that there was an arrangement between them for the benefit of the Posners for Boesky to buy and park in excess of 10% of Fischbach stock, to file 13Ds and thereby fraudulently void the Fischbach standstill agreement; and Boesky's purchases would be guaranteed against loss.

33. Milken claimed that it was Boesky who had first expressed an interest in purchasing Fischbach. Milken claimed he merely told Boesky that he thought "it would be a good idea." Milken admitted on the witness stand that he "encouraged" Boesky to buy Fishbach and told him he would not lose money on the stock because the investment "had little to no downside risk." Milken claimed that he had nothing to do with a scheme to break the standstill agreement between the Posners and Fischbach. Thus, according to Milken, based on nothing more than mild encouragement and persuasive reasoning, Boesky proceeded to commit more than $21 million of his firm's capital to acquiring a position that was, in size and longevity, totally out of character with his usual arbitrage trading.

34. In response to a question from the bench, Milken testified that he gave Boesky "a number of reasons" why he thought Boesky would not lose money on Fischbach, principal among them that Victor Posner had announced an interest in buying more Fischbach stock. In response to the Court's questioning, however, Milken admitted that, as long as the standstill was still in effect, Posner could not buy any additional shares.

35. Consistent with his allocution, Milken admitted at trial that he had indeed assured Boesky that Drexel would make good on any losses he sustained on his Fischbach purchases. In his trial testimony, however, Milken claimed that he did not give Boesky that assurance until late 1984—by which time Boesky already had a loss on paper of at least $6.5 million. Milken explained that he took this unusual step for Boesky "because of the ... future relationship we hoped to have with his firm." Milken added, "We also had the option to buy [Boesky's] shares." When asked whether the option was in writing, Milken admitted it was undocumented. Then, when asked whether anyone else at Drexel knew of this "option," Milken backed away from it altogether: "I don't think we would even use the word 'option.' In other words, there was no option from that standpoint. So no one knew about the option since it did not exist."

36. Milken's version of the guarantee against loss makes no sense. It is inconceivable that Milken would have given such a guarantee after Boesky had already sustained an enormous loss; it would be like someone volunteering to guarantee a business associate's multi-million dollar loan after it is already in default. Moreover, Milken's version provides no rational basis for Boesky's holding Milken responsible for the loss or Milken's accepting that responsibility.

37. Milken's testimony failed credibly to rebut Boesky's testimony that Milken specifically indicated to Boesky that he should acquire more than 10 percent of Fischbach. When asked at trial whether he had done so, Milken responded, "I don't believe so, sir, but I did not discourage him." He acknowledged having told Boesky, "[T]he more stock you own, the higher price you would get." He also admitted being kept apprised from time to time of Boesky's Fischbach activities, and acknowledged the possibility that he had been informed by one of Boesky's employees—as memorialized in that employee's contemporaneous memorandum—of the need for Boesky to make a Hart–Scott–Rodino filing before he could proceed to cross the 10 percent threshold. The Criminal Information to which Milken pleaded guilty charged that he

told Boesky to buy more than 10 percent of Fischbach; he clearly "encouraged" it in "Wall Street-ese."

38. As to making up Boesky's losses on Fischbach, Milken professed at trial to have no recollection of having previously seen Boesky's November 28, 1984, letter to him seeking a reconciliation of their mutual accommodations. The letter read, "Enclosed you will find a self-explanatory list of information through and including November 27, 1984. I think that it will be appropriate to resolve all of the enclosed." Attached to it were schedules relating to profit and loss positions on several different securities including Fischbach and MCA, both of which were subjects of Milken's guilty plea. What makes Milken's claim that he had never seen the letter particularly difficult to accept is that he also claims "not to recall" whether he had any kind of profit-sharing arrangement with Boesky regarding these securities.

39. As a witness, Boesky presented a striking contrast to Milken. While Milken was evasive, Boesky was direct. While Milken was hesitant about committing himself about his admitted misdeeds, Boesky was frank about his. Milken sought to exploit every ambiguity and hole in his prior statements to cast his conduct in an innocent light; Boesky simply told his story. Milken gave the appearance of someone who cannot, and therefore will not, accept the fact that he has done wrong; Boesky gave the appearance of someone who has owned up to his transgressions. Perhaps most importantly of all, Boesky's story made sense and had the ring of truth to it; Milken's did not. For all those reasons, among others, the Court judges Boesky to be the far more credible witness and accepts his version of the transactions.

### III. BURNUP & SIMS

40. Burnup & Sims was at all times relevant a Delaware corporation headquartered in Fort Lauderdale, Florida and engaged in the telephone and cable television businesses. Its stock was registered with the Commission and traded over-the-counter. In January 1976, Sharon Steel filed a Schedule 13D disclosing ownership of 5.6 percent of Burnup & Sims's outstanding common stock. By October 1979, Sharon Steel and several other companies controlled by Victor Posner had accumulated 28.78 percent of the stock. In September 1982, they raised their stake in Burnup & Sims to approximately 32.3 percent.

41. On September 30, 1982, Burnup & Sims brought an action against the Posner group seeking injunctive relief against the group's acquiring additional Burnup & Sims stock or seeking to gain representation on or control of the Burnup & Sims board. On December 16, 1982, the court temporarily enjoined the group from seeking to displace or modify the composition of the board. On December 29, 1982, the Posner group filed an amended Schedule 13D in which it stated that it intended to seek control of Burnup's board of directors and management and was "considering possible ways of accomplishing that objective."

42. On May 18, 1983, Boesky bought 150,000 shares of Burnup & Sims stock. No one in the Boesky Organization had done any research on the stock as of the time Boesky bought it and, at trial, Boesky could not even recall what business the company was in.

43. Boesky bought Burnup & Sims after Steven Posner called and "encouraged" him to do so, expressing the view that Boesky would make a 20 percent profit on the investment. However, the plaintiff failed to sustain its burden of proof that this was the equivalent of a commitment by Posner to guarantee Boesky's investment profit.

44. Boesky held the Burnup & Sims stock for twenty-one months and made no attempt to sell it. Periodically Boesky asked Steven Posner when would be a good time to sell. In response, Steven Posner told him, "[D]on't worry about it, just ... be patient, relax."

45. Milken had not induced Boesky to purchase Burnup & Sims stock, nor did he guarantee Boesky against loss. Boesky appears to have at one time taken the position that Burnup was a reconciling item with Milken, but after discussion between Boesky and Milken, the two agreed that it was not. Burnup was not a "Milken responsibility".

*The "Tag–Along" Shares*

46. While Boesky held the Burnup & Sims stock, the Posners were engaged in negotiations with Nick Caporella, president and CEO of Burnup & Sims, regarding a proposed buy-back by Burnup & Sims of the Posners' stock in the company. Alan Brumberger of Drexel participated in the negotiations in an effort to make peace between the two sides, both of whom were Drexel clients. During the course of these negotiations, Caporella indicated to Brumberger that he had been given to understand that any buy-back of the Posners' stock would also have to include a buy-back of Burnup & Sims stock held by others, which Caporella did not want to buy.

47. Dan Stoller, a lawyer at Skadden Arps who represented Burnup & Sims was involved in Burnup's attempts to buy back its stock from the Posners. During these negotiations with the Posners, Stoller came to learn that, not only did the Posners want Burnup to purchase their shares, but they also wanted Burnup to buy shares owned by others "described to us as being friendly to the Posner interests." Stoller testified these "friendly shares" included the Burnup & Sims stock owned by Boesky.

48. Stoller referred to the Burnup & Sims stock held in hands friendly to the Posners as the "tag-along shares." Stoller, who dealt with Donald Glazer and other Posner representatives in connection with Burnup & Sims, understood that a buy-back of the Posners' shares would also have to include tag-along shares owned by Boesky, and "that these were friendly shares and they should be treated the same as the Posner shares." Stoller testified that the tag-along shares remained an issue on the table for the duration of the negotiations in which he was involved.

49. According to Posner representatives and negotiators, Stoller understood that Victor Posner was the final decision maker in connection with any transaction between the Posner companies and Burnup & Sims. In addition, Stoller understood that prior to presenting the terms of a proposed buy-back to Victor Posner, such terms had to be first approved by Steven Posner.

*Boesky Eventually Sells His Shares At A Profit*

50. Boesky eventually sold his Burnup & Sims stock in February 1985, realizing a gross profit of approximately 18 percent, or $232,312.50 on the sale.

IV. *FINDINGS PERTAINING TO INJUNCTIVE AND ANCILLARY RELIEF AND TO VICTOR POSNER'S AND STEVEN POSNER'S FITNESS TO SERVE AS OFFICERS AND DIRECTORS OF PUBLIC COMPANIES*

*Prior SEC and Criminal Actions*

51. Both Victor Posner and Steven Posner are recidivist violators of the federal securities laws. In 1972, the SEC filed an action in the United States District Court for the Southern District of New York against Victor Posner and a number of companies under his control. In its complaint, the SEC alleged that Victor Posner illegally used the assets of Sharon Steel pension funds to invest in securities issued by corporations in which he had a substantial beneficial interest; that he illegally used the pension funds' assets to meet corporate obligations of Posner-affiliated companies; and that he and DWG failed to file required reports with the Commission. The SEC alleged that that conduct violated sections 10(b) and 13(d) of the Exchange Act and Rules 10b–5 and 13d–1 thereunder and sought injunctive relief. Without admitting or denying the allegations of the complaint, Victor Posner and the other defendants consented to the entry of a permanent injunction prohibiting them from engaging in future violations of those provisions of the federal securities laws.

52. In 1977, the SEC filed an action in the United States District Court for the District of Columbia against Victor and Steven Posner, Sharon Steel, DWG, and other individual and corporate defendants. In its complaint, the SEC alleged that the Posners caused Sharon Steel and other companies under their control to pay for a wide variety of personal expenses and things of value for the Posners, at a total cost to the companies of over $1.7 million; that Sharon Steel and its parent, NVF, filed false financial state-

ments; and that the Posners made false entries on the books of public companies under their control. The SEC alleged that that conduct violated section 10(b) of the Exchange Act and Rule 10b–5 thereunder, as well as other provisions of the federal securities laws and sought injunctive relief against the defendants. Without admitting or denying the allegations of the complaint, Victor Posner, Steven Posner, and the other defendants consented to the entry of a permanent injunction prohibiting them from engaging in future violations of those provisions of the federal securities laws.

53. In addition to his having consented to the issuance of two SEC injunctions against him, Victor Posner is also a convicted felon. In April 1982, he was indicted on ten felony counts charging him with inflating the appraisals on land that he donated to Miami Christian College. The case was tried to a jury. At the conclusion of the trial, the jury returned a verdict finding Posner guilty on all ten counts. The trial judge thereafter set aside the verdict after learning that a juror had read news stories about Posner during the trial. Posner thereupon entered a plea of *nolo contendere* to all ten counts.

### The Posners Were Acting as Officers and Directors

54. Victor and Steven Posner engaged in the conduct giving rise to this action in their capacities as officers and directors of Sharon Steel, PEC, and other public companies.

### Self–Dealing and Corporate Waste at DWG

55. Victor Posner and Steven Posner have had a long and notorious history of engaging in self-dealing and corporate waste to the detriment of the public shareholders of companies under their control. Such conduct has been perhaps most thoroughly documented in *Granada Investments, Inc. v. DWG Corp.*, No. 1:89CV0641 (N.D.Ohio filed Apr. 10, 1989), a recently concluded shareholders' derivative suit. In that case, pursuant to a court-approved settlement agreement, Chief Judge Thomas D. Lambros appointed three

directors to the DWG board to serve, in essence, as watchdogs to ensure compliance with the terms of the settlement. Judge Lambros has described the three court-appointed directors of DWG as "special advisors to th[e] court" and "quasi-judicial officials." He stated that they

> are fulfilling a rather unique fiduciary responsibility beyond that of merely being another director of the corporation, in a sense serving under the direction and authority of this court in a dual capacity and [as] an officer of this Court.

*Id.* at 15 (quoting transcript of proceedings in open court). In view of their unique status, he held that their reports "are entitled to presumptive validity." *Id.* at 18.[4]

56. The order approving the settlement provided, *inter alia*, that "[t]he three new directors shall report to the Court any violations of the stipulated settlement pursuant to a provision in the stipulation for the Court to retain continuing jurisdiction over the enforcement of the stipulation." Over the ensuing months, the court-appointed directors submitted a number of reports detailing violations of the settlement terms. The reports show that, as recently as June 1992, the Posners were abusing their powers as officers and directors of a large, diversified public company. They provide a vivid picture of how the Posners continued to enrich themselves at the expense of DWG's other shareholders as DWG's financial condition deteriorated rapidly. They depict as well Victor Posner's contempt for the most basic principles of corporate governance.

57. The following excerpts from the reports are representative of their content:

> The problem very simply is that Victor Posner sees no difference between his personal assets and those of DWG and its subsidiaries. He does not deal honestly and forthrightly with people.

> The Special Committee's investigations revealed not only the scope of a very serious problem but also the primary source of that problem—self-interested actions by

4. The terms and subsequent history of Judge Lambros's February 14, 1992, order are dis-

cussed below in paragraph 59 and footnote 5.

Victor Posner which have not been curbed by the Order of this Court or the systems of democratic corporate governance sought to be imposed by that Order.

The Special Committee was shocked to find that, in spite of the financial problems these corporations are experiencing and their debt to a corporation to which Mr. Posner owes a fiduciary duty, Victor Posner and Steven Posner have been accepting salaries from each of these companies in preference to payments owing to the [DWG] Common Cost Center.

Cumulative voting was in effect at the [shareholders'] meeting.... The result was that Mr. Posner, who controlled in excess of 45 percent of the vote, was in a position to concentrate his votes to elect two new directors and spread his remaining votes to control which of the remaining Management nominees would be re-elected.... [¶] The result of the voting was that Mr. Prendergast and Mr. Pallot [the two incumbent directors on the Special Committee] were not elected.

The bankruptcy of PEC [*i.e.,* Pennsylvania Engineering Corp.] highlights the threat to DWG stockholders of Victor Posner's non arms-length credit judgments and also emphasize the grave need for immediate measures to assure that DWG's interests are protected.

Victor Posner eats at DWG expense at least once a day. He dines at the finest establishments and spends exorbitant amounts on his meals.... There is no legitimate business purpose for these meals. The charges for these meals are not related to DWG business....

Total Amount Charged [for
Victor Posner's meals]
From 1–1–91 through 12–31–91    $173,270

The combined payments [of salary to Victor Posner] exceed $16,000 per day.... [¶] ... [T]he payment to Mr. Posner of salaries of the magnitude he has been receiving is wasteful of corporate assets, not reflective of the value of the services provided and contrary to basic principles of Ohio law governing the compensation of executive officers.

Mr. Posner's waste and corporate mismanagement are confirmed daily by the continued provision of services to corporate affiliates of Mr. Posner which end up being direct costs to DWG Corporation.

Victor Posner has received salaries and bonuses of over $31 million from DWG over the past five years—more than DWG's net earnings, which totaled less than $26 million, including its three loss years. The Compensation Committee is told that "no one deserves a raise" while the Corporation continues to lose loyal and effective employees, due to a salary freeze imposed by Victor Posner for the previous five years. Meanwhile, Mr. Posner continues to draw salary at the rate of $10,000 per day, 365 days a year. While salaries remain frozen, the Chairman on the average spends in excess of $500 per day, seven days a week, on food and drinks, charging the same to DWG.... While DWG ... has trouble finding the cash to pay its creditors and loyal employees, invariably it finds the cash to pay Mr. Posner.

Attending a DWG directors' meeting is like attending an old-fashioned camp meeting. Mr. Posner is the preacher and his relatives and other hand-picked directors respond "Amen" to his every statement, no matter how outlandish.... Messrs.... Pallot and Prendergast tried to be independent members of the Board of Directors. They were removed by Mr. Posner....

58. Harold Kelley, a court-appointed director of DWG since February 1991 and chairman of the special committee, testified at trial. Mr. Kelley—a lawyer and certified public accountant who has served as chairman of the Kentucky Public Utilities Commission and twice as a member of the Kentucky State Racing Commission—attested to the truth and accuracy of the court-appointed directors' reports. Mr. Kelley further testified,

[W]e [the court-appointed directors] just saw [DWG] following a pattern that we had learned about when we looked at some of the court records that happened to some of the other companies that Mr. Posner

had controlled and had been put into bankruptcy and so forth. So we saw [DWG] going in the same direction ...

... [W]e knew from all the evidence that was given to us and that we could find that this whole situation was just a cash plan to Mr. Posner. The cash was going to him, and the company was just bleeding red....

It was, according to Mr. Kelley, the observation of the court-appointed directors that Victor Posner had let DWG "run amuck [sic] and down the drain and ... that [DWG] was going to be just exactly like Sharon Steel and Evans Products and PEC and APL."

59. Based on the reports of the court-appointed directors, Judge Lambros concluded that "Victor Posner is engaged in the flagrant and systematic diversion of DWG assets for his own benefit," and that "[h]is acts of corporate waste and self-dealing compel the [Court's] immediate intervention." Accordingly Judge Lambros entered an order which provided, inter alia, that Messrs. Prendergast and Pallot be reinstated to the board, that Victor Posner remit certain payments to the clerk of the court, and that neither Victor nor Steven Posner accept payment of any salary pending further order of the court.[5]

### Self–Dealing and Corporate Waste at Sharon Steel

60. Conduct similar to that described in the reports of the court-appointed directors of DWG is also described in findings made in connection with the Sharon Steel bankruptcy proceedings. In 1988, the United States Bankruptcy Court for the Western District of Pennsylvania placed Sharon Steel, which the Posners then controlled, under the stewardship of a trustee concluding, inter alia, that "Victor Posner's huge withdrawals from Sharon at a time of financial crisis, his refusal to be deposed, and his erratic conduct before the court, constitute gross mismanagement, incompetence in terms of managing and directing the course of Sharon in these reorganization proceedings, and constitute a basis for the appointment of a trustee." In re Sharon Steel Corp., 86 B.R. 455, 466 (Bankr.W.D.Pa.1988), aff'd, 871 F.2d 1217 (3d Cir.1989). In reaching that conclusion, the court found, inter alia, that

- compensation paid to Victor Posner and Steven Posner was "excessive, and possibly recoverable as fraudulent conveyances";

- Posner caused Sharon Steel to pay $4.4 million in attorneys' fees for his personal defense on the tax evasion charges without apparent justification;

- "at a time when Sharon's manufacturing facilities desperately needed repair, Posner withdrew millions of dollars for personal use and paid off $294 million in secured bank loans while putting in place, or leaving in place, a $30 million working capital loan at 28%–30% interest per annum, allowing the facility to deteriorate, and so denuding Sharon of cash that trade credit became unavailable";

- the "obvious purpose" of transfers of assets from Sharon to other entities under common control "was to shield the transferred assets from Sharon's outside

5. An appeal was taken from the February 14 order four days after it was issued. The Sixth Circuit stayed the order pending appeal on the ground that the relief ordered was more in the nature of a preliminary injunction than a temporary restraining order and that, therefore, it should not have been granted without notice and an opportunity to be heard. Sixth Circuit Order dated February 21, 1992. On February 24, 1992, Judge Lambros commenced an evidentiary hearing. Early in the proceedings, Victor Posner absented himself from the courtroom claiming that poor health precluded his continued presence at and participation in the hearing. Judge Lambros thereupon referred criminal contempt charges against Victor Posner to the United States Attorney and ordered an evidentiary audit of DWG pursuant to Rule 53 of the Federal Rules of Civil Procedure.

Shortly thereafter, plaintiff Granada Investments moved the district court to vacate its February 14 order on the ground that the referral of criminal contempt charges against Victor Posner and the ordering of the Rule 53 audit had rendered the order moot. The appeal was dismissed based on the district court's certification that it was inclined to vacate the February 14 order upon remand of the appeal from that order. Sixth Circuit Order dated May 6, 1992. On remand, Judge Lambros vacated the order. See letter from SEC Counsel to the Court dated July 14, 1993.

creditors and thereby hinder and delay recovery by them if not defeat completely any collection efforts by such creditors";

- the appointment of a trustee was mandatory based on "conclusive evidence" of, *inter alia,* "self-dealing, transfer of huge assets to other companies under common control with Sharon and away from the reach of creditors, stripping the debtor of cash, [and] depleting the assets of the debtor so as to require working capital loans at an unreasonably high interest rate."

*Id.,* 86 B.R. at 461, 463, 466.

### Additional Allegations of Self–Dealing and Corporate Waste

61. Self-dealing and abuse of control over corporate assets were the essence of the claims alleged against the Posners in previous SEC actions against them. In *SEC v. Posner,* SEC Lit.Rel. No. 5451, 1972 SEC Lexis 1718 (S.D.N.Y. June 30, 1972), the SEC alleged that Victor Posner illegally used the assets of Sharon Steel pension funds to invest in securities issued by corporations in which he had a substantial beneficial interest, and to meet corporate obligations of other Posner-affiliated companies; and that he and DWG failed to file required reports with the Commission. In *SEC v. Sharon Steel Corp.,* SEC Lit.Rel. No. 8119, 1977 SEC Lexis 799 (D.D.C. Sept. 20, 1972), the SEC alleged that Victor and Steven Posner caused Sharon Steel and other companies under their control to pay for a wide variety of personal expenses and things of value for the Posners, at a total cost to the companies of over $1.7 million; that Sharon Steel and its parent,

NVF, filed false financial statements; and that the Posners made false entries on the books of public companies under their control.

### The Posners Declined the Court's Express Invitation to Testify Regarding Their Fitness to Serve as Officers and Directors

62. At trial, the Court expressly invited Victor and Steven Posner, both of whom were present for most of the trial, to take the witness stand and testify regarding matters pertinent to the SEC's request that the Court issue an order barring them from serving as officers and directors. They declined to do so.[6]

### Summary

63. The Posners have repeatedly abused their positions in public companies, engaged in self-dealing, enriched themselves at the expense of public shareholders, and generally conducted themselves in ways that are the antithesis of what one expects of a corporate fiduciary.

### CONCLUSIONS OF LAW

64. This Court has jurisdiction of this action pursuant to sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

I. *THE DEFENDANTS VIOLATED SECTIONS 10(b) AND 13(d) OF THE EXCHANGE ACT AND RULES THEREUNDER*

A. *Reporting Requirements Under Section 13(d) and the Rules Thereunder*

65. Section 13(d) of the Exchange Act and the rules thereunder require that a

---

6. During the course of discovery in this case and in the SEC investigation preceding the commencement of the action, the Posners repeatedly declined to testify in reliance on their rights under the fifth amendment. Shortly before the trial began, they indicated that they intended to testify at the trial. On the SEC's motion, the Court entered an order on May 7, 1993, precluding them from testifying as to any matters on which they had previously declined to testify on fifth amendment grounds. *See, e.g., Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 575–77 (1st Cir.1989) (it "would be an abuse of the fifth amendment to allow [the defendant] to claim the privilege against self-incrimination during discovery and concurrently subject plaintiff to the possibility that at the eleventh hour he might waive the privilege and testify at trial"); *SEC v. Cymaticolor Corp.,* 106 F.R.D. 545, 549–50 (S.D.N.Y.1985); *SEC v. Graystone Nash, Inc.,* 820 F.Supp. 863, 869–70 (D.N.J.1993); *SEC v. Zimmerman,* Civil Action No. 1:92–CV–1145–JOF, slip op. (N.D.Ga. March 24, 1993); *SEC v. Mason Benson,* [1984–1985 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,001, 1985 WL 1308 (S.D.N.Y. April 9, 1985); R. Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 Yale L.J. 1062, 1130–31 (1982). At trial, the Court made clear that its preclusion order would not prevent the Posners from testifying regarding their fitness to serve as officers and directors. Tr. at 279, 342–43.

person acquiring beneficial ownership of more than 5 percent of a class of registered equity securities shall disclose that fact within ten days after passing the 5 percent threshold. The purpose of section 13(d) is to alert the marketplace to large, rapid accumulations of securities which might represent a potential shift in corporate control. *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979); *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). Section 13(d) is not a mere "technical" reporting provision; it is, rather, the "pivot" of a regulatory scheme that may represent " 'the only way that corporations, their shareholders and others can adequately evaluate ... the possible effects of a change in substantial shareholdings.' " *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230, 1230 n. 21 (D.C.Cir.1989) (quoting statement of Senator Williams, sponsor of the Williams Act, 113 Cong.Rec. 855 (January 18, 1967)).

### 1. *Beneficial Ownership*

66. A "beneficial owner" is required to file a disclosure statement under section 13(d). Rule 13d–3 defines a "beneficial owner" as

any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

To prevent evasion, Rule 13d–3(b) provides,

Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of Section 13(d) or 13(g) of the Act shall be

deemed for purposes of such sections to be the beneficial owner of such security.

67. As to the determination of the number of shares beneficially owned, Rule 13d–3(c) provides,

All securities of the same class beneficially owned by a person, regardless of the form such beneficial ownership takes, shall be aggregated in calculating the number of shares beneficially owned by such person.

68. Thus beneficial ownership can arise out of "arrangements," "relationships," and "devices," as well as "contracts" and "understandings." Deliberate efforts to conceal legal ownership do not affect the determination of beneficial ownership. Indeed, it does not turn on who owns legal title to the stock, or who is the registered owner, or in whose name it is held. Instead the inquiry "focuses on any relationship that, *as a factual matter,* confers on a person a significant ability to affect how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practicable matter, to influence the use of that power." 3 Securities Law Techniques § 70.07[2][c] (A.A. Sommer, Jr. ed., 1987) (emphasis in original).

### 2. *Groups Under Section 13(d)*

69. Even if a person beneficially owns less than 5 percent of a class of securities, he will have a reporting obligation if he is part of a group which in the aggregate owns 5 percent or more. Whether a person is a member of a "group," as that term is used in section 13(d), turns on whether the members have "combined in furtherance of a common objective." *Wellman v. Dickinson,* 682 F.2d 355, 363 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). This concerted action need not be reflected in writing; the arrangements may be formal or informal. *Wellman,* 682 F.2d at 363. *See also SEC v. Savoy Industries Inc.,* 587 F.2d 1149, 1163 (D.C.Cir.1978), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Trans World Corp. v. Odyssey Partners,* 561 F.Supp. 1315, 1323 (S.D.N.Y. 1983).

### 3. Information Required to Be Disclosed Under Section 13(d)

70. Under section 13(d), beneficial owners must disclose such information as the Commission requires. The disclosure required by Schedule 13D includes the following: the identity and background of the filing person; the number of shares and the percentage of the class of securities beneficially owned; a description of any transaction (including the parties thereto) through which the filing person has obtained, or will obtain, funds or other consideration "for the purpose of acquiring, holding, trading or voting" the securities; and the purpose of the acquisition, including plans regarding possible acquisition of additional securities or disposition of securities or an extraordinary corporate transaction. Item 6 of Schedule 13D specifically requires disclosure of "guarantees of profits" and "division of profits or loss."

71. All information disclosed in a Schedule 13D must be true and accurate. GAF Corp., 453 F.2d at 720. As the Second Circuit has observed, "section 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. Disclosure which is false or misleading subverts this purpose." Id., 453 F.2d at 720. See also General Aircraft Corp. v. Lampert, 556 F.2d 90, 96 & n. 9 (1st Cir.1977). There is also a "continuing obligation on the person filing to amend his statements '[i]f any material change occurs in the facts set forth.'" GAF Corp., 453 F.2d at 720 (quoting section 13(d)(2)).

### B. Section 10(b) Violations Flowing from Material Misrepresentations or Omissions in a Schedule 13D

■ 72. A violation of section 13(d) may also constitute a violation of section 10(b) and Rule 10b–5 thereunder. The "in connection with" requirement of the latter provisions is satisfied by the filing of a Schedule 13D. Savoy Industries, 587 F.2d at 1171. To establish liability under section 10(b) and Rule 10b–5, it must be shown that the Schedule 13D contained material misrepresentations or omitted to state material facts. See, e.g., Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1040 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). It must also be shown inter alia that the defendant acted with scienter, Aaron v. SEC, 446 U.S. 680, 692, 100 S.Ct. 1945, 1953, 64 L.Ed.2d 611 (1980), "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). Recklessness or conduct representing an extreme departure from the standards of ordinary care may be sufficient to establish scienter. See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1244 (3d Cir.1989); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961–62 (5th Cir.) (en banc), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.1990) (en banc), cert. denied, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991); Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir.1982).

### C. Aiding and Abetting

■ 73. It is well established that liability under the federal securities laws may be imposed based on theories of secondary liability. See, e.g., IIT v. Cornfeld, 619 F.2d 909, 921 (2d Cir.1980) (listing elements of claim of aiding and abetting violations of securities laws).[7] The elements of aiding and

---

7. The other circuits have likewise recognized that liability may be imposed based on such theories. See, e.g., Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir.1983); Walck v. American Stock Exchange, Inc., 687 F.2d 778, 790 (3d Cir.1982), cert. denied, 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); Schatz v. Rosenberg, 943 F.2d 485, 495 (4th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); Woodward v. Metro Bank of Dallas, 522 F.2d 84, 94 (5th Cir.1975); Molecular Technology Corp. v. Valentine, 925 F.2d 910, 917 (6th Cir.1991); Robin v. Arthur Young & Co., 915 F.2d 1120, 1123 (7th Cir.1990), cert. denied, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); FDIC v. First Interstate Bank of Des Moines, 885 F.2d 423, 429 (8th Cir.1989); Roberts v. Peat, Marwick, Mitchell & Co., 857 F.2d 646, 652–53 (9th Cir.1988), cert. denied, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989);

abetting are (1) a primary violation, (2) knowledge of the primary violation on the part of an alleged aider and abettor, and (3) substantial assistance rendered by the aider and abettor in the commission of the primary violation. *Wellman v. Dickinson,* 475 F.Supp. 783, 831 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *Rolf,* 570 F.2d at 47.

### D. *Violations of Sections 10(b) and 13(d) and the Rules Thereunder*

#### 1. *Fischbach*

74. Victor Posner and PEC violated section 13(d) by failing to amend their Schedule 13D to disclose their beneficial ownership of the Fischbach stock bought by Boesky in mid–1984. When they later bought the stock from Boesky, they failed to report in the amendment disclosing the purchase that Boesky was the seller and that they already had a preexisting beneficial interest in the stock. Steven Posner aided and abetted these section 13(d) violations by encouraging Boesky's participation in the scheme in the first place and by thereafter reassuring Boesky that he would not lose money on his Fischbach position.

75. Boesky likewise violated section 13(d) and the rules thereunder by failing to disclose in the Schedules 13D he filed that he had taken the position in Fischbach on behalf of the Posners and that he had no risk in the transaction. (Indeed this was the basis of the single criminal count to which Boesky pleaded guilty in April 1987.) The Posners aided and abetted those violations in that they stood ready to compensate him for any losses sustained on the position and eventually bought his stock at a price almost $9 higher than the prevailing market price.

76. The arrangement with Boesky also constituted a blatant scheme to defraud in violation of section 10(b) and Rule 10b–5. The very essence of the scheme was to defraud Fischbach by creating the false appearance that the standstill agreement had been voided by a third party's purchase of more than 10 percent of the company's outstanding stock.

77. The defendants argue that they cannot be held liable for violations flowing from Boesky's Fischbach purchases because there is no evidence linking them to the arrangement between Boesky and Milken. There is, to the contrary, substantial evidence of it. Boesky testified that, from the inception, Steven Posner was in on the scheme and that, from time to time thereafter, Steven Posner reassured him that he would suffer no losses on Fischbach. Drexel investment banker Alan Brumberger testified that Victor Posner approved the financing by which the Posners acquired Boesky's Fischbach shares. Victor Posner tracked Boesky's purchases of Fischbach stock through copies of his 13D's furnished to him by in-house counsel Edward Christensen. The testimony of literally every trial witness supports the inference that Victor Posner dominated the affairs of the companies under the Posners' control; that only Victor Posner could commit any significant amount of their companies' capital; and that it is inconceivable that a scheme such as the one by which the Posners acquired control of Fischbach could have been carried out without his knowledge and approval. The inference is reinforced by the absence of any other plausible explanation for Boesky's and Milken's actions. The preponderance of the evidence supports the conclusion that the defendants violated sections 10(b) and 13(d) of the Exchange Act and the rules thereunder in connection with the fraudulent scheme by which they gained control of Fischbach.

---

*Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992); *Rudolph v. Arthur Andersen & Co.,* 800 U.S. 1040, 1045 (11th Cir. 1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); *Investors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980).

The Supreme Court has recently granted certiorari on the question whether there is an im-plied private right of action for aiding and abetting violations of section 10(b) of the Exchange Act and Rule 10b–5 thereunder. *First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891 (10th Cir.1992), *cert. granted sub nom., Central Bank of Denver v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993).

### 2. *Burnup & Sims*

78. Plaintiff did not sustain its claims in respect to the Posners' beneficial ownership of 150,000 shares of Burnup & Sims stock, notwithstanding that it was represented that if the company wanted to buy back the Posners's stock it would also have to buy back Boesky's stock on the same terms. The claims set forth in the complaint thereon are dismissed.

## II. *VIOLATIONS OF THE BOOKS AND RECORDS AND MARGIN PROVISIONS OF THE EXCHANGE ACT*

### A. *Aiding and Abetting Violations of the Record–Keeping Requirements of Section 17(a)(1) of the Exchange Act and Rules 17a–3 and 17a–4 Thereunder*

79. Section 17(a)(1) of the Exchange Act requires that brokers and dealers make, keep, and furnish such records and reports as the Commission, by rule, prescribes as necessary and appropriate in the public interest and for the protection of investors. Rule 17a–3 requires broker-dealers to maintain records reflecting positions carried for their own account and for the accounts of customers. The Commission has emphasized the importance of the records required by the rules, describing them as "the basic source documents and transaction records of a broker-dealer," Statement Regarding the Maintenance of Current Books and Records by Broker and Dealers, Exchange Act Release No. 10756, 1974 SEC Lexis 3290 (April 26, 1974), and as a "keystone of the surveillance of brokers and dealers by our staff and by the [securities] industry's self-regulatory bodies." *In re Edward J. Mawod & Co.*, 46 SEC 865, 873 n. 39 (May 6, 1977), *aff'd*, 591 F.2d 588 (10th Cir.1979). Scienter need not be shown to prove a violation of section 17(a)(1) of the Exchange Act and the rules thereunder. *See Stead v. SEC*, 444 F.2d 713, 716–17 (10th Cir.1971), *cert. denied* 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 746 (1972).

80. Boesky's purchases of Fischbach stock were not accurately reflected in the books and records of the registered broker-dealers under his control and through whom he effected the purchases and held the securities. Specifically the books and records failed to reflect the Posners' beneficial interest in the securities. The broker-dealers thus violated the books and records provisions of the Exchange Act and, by their participation in the scheme, the Posners aided and abetted those violations.

### B. *Violations of the Margin and Credit Requirements of Section 7 of the Exchange Act and Regulations T and X*

81. Section 7 of the Exchange Act and the regulations thereunder govern the use of credit for the purchase or carrying of securities. While the rules and regulations relating to margin requirements are promulgated by the Board of Governors of the Federal Reserve System, the Commission has authority to bring enforcement actions under this section for violations committed by brokers and dealers. Section 7(c) prohibits brokers or dealers from extending or maintaining credit to or for any customer without collateral or on any collateral other than securities, except as prescribed by the Board of Governors.

82. Regulation T was promulgated to regulate, among other things, the circumstances in which credit may be extended by brokers and dealers to customers. Customer is defined in Regulation T as "any person ... to or for whom a creditor extends, arranges or maintains any credit." 12 C.F.R. § 220.-2(c)(1)(i) (1990). For nonexempt securities, customers are required to provide fifty percent of the current market value of the security. Regulation X requires that persons who obtain credit to purchase or carry securities do so in accordance with the other margin requirements promulgated pursuant to section 7 of the Exchange Act.

83. When Boesky bought securities for the Posners, he was effectively extending credit to them for the full value of the securities and the Posners were buying them without putting any money up for them. Since this extension of credit exceeded the allowable margin, it violated Regulation T. By their participation in the scheme, the Posners aided and abetted Boesky's violations of Regulation T and directly violated Regulation X.

## III. THE POSNERS SHALL BE EN-JOINED—AGAIN—FROM ENGAGING IN FUTURE VIOLATIONS OF THE FEDERAL SECURITIES LAWS

■ 84. The propriety of injunctive relief turns on whether "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir.1972). *See also SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir.1978). Among the factors to be considered in making that determination are

the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). All of those factors weigh in favor of permanent injunctive relief here.

85. The defendants' violations were committed with a high degree of scienter. The Supreme Court has described scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12. The Posners used the reporting requirements of section 13(d) as a vehicle to nullify by fraudulent means their standstill agreement with Fischbach. In the process, they deceived the market by inducing Boesky to identify himself falsely as a substantial holder of Fischbach stock while, at the same time, concealing the true size of their own position.

86. There has been no recognition on the defendants' part of the wrongfulness of their conduct, nor have they offered any assurances that they will not engage in future violations. Nor, in light of their past violations, would any such assurances be creditworthy. Both Victor Posner and Steven Posner are repeat offenders. Both have previously been enjoined from engaging in Rule 10b-5 violations, and Victor Posner from

committing section 13(d) violations. There is every reason to believe that, absent further injunctive and ancillary relief, the Posners will continue to abuse their positions as officers and directors of public companies to engage in future violations.

## IV. DISGORGEMENT

■ 87. Disgorgement is one of the most common forms of ancillary relief granted in SEC enforcement actions and has been ordered in a wide variety of cases. *See, e.g., First City*, 890 F.2d at 1230 (section 13(d) parking violation); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987), *cert. denied sub nom. Transatlantic Fin. Co., S.A. v. SEC*, 486 U.S. 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988) (insider trading); *SEC v. Blavin*, 760 F.2d 706, 712-13 (6th Cir.1985) (misrepresentations and failure to register by investment adviser); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir.1984) (insider trading); *Manor Nursing Centers, Inc.*, 458 F.2d at 1103-04 (violations of registration and antifraud provisions); *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1307-08 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971) (insider trading); *SEC v. Bilzerian*, 814 F.Supp. 116 (D.D.C.1993) (appeal filed) (violations of antifraud, section 13(d), and tender offer provisions); *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1260 (D.D.C.1975) (violations of antifraud and reporting provisions, including section 13(d)).

88. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *First City*, 890 F.2d at 1230. *See also Blavin*, 760 F.2d at 713; *Tome*, 833 F.2d at 1096; *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978); *ChrisCraft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 390-391 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Manor Nursing Centers*, 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable"); *Texas Gulf Sulphur Co.*, 446 F.2d at 1308 ("It would severely defeat the purposes of the [Exchange] Act if a violator

of Rule 10b–5 were allowed to retain the profits from his violation").

89. The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." *First City*, 890 F.2d at 1231. The wrong-doer, who has created the uncertainty by his violation, bears the risk of uncertainty. *Id.* at 1232 (*citing SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir.1983) (*en banc*); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 171 (2d Cir.1980)). *See also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"). Since it is difficult in many cases to separate "legal from illegal profit . . . it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains." *Bilzerian*, 814 F.Supp. at 121 (citations omitted). "The SEC need only offer a prima facie reasonable approximation; the burden then shifts to defendant to rebut the presumption," and the risk of uncertainty should fall on the wrongdoer. *Id.* at 121–22.

90. Had it not been for their fraudulent arrangement with Milken and Boesky, the Posners would not have been able to acquire control of Fischbach and thus would not have been able to place themselves in high-paid positions at the company. Accordingly they shall be required to disgorge the money paid to them ostensibly as compensation for their services as officers and directors of Fischbach. Any contention they might make that their services were of real value to the company is belied by the results reported in Fischbach's public filings.

91. The following chart sets forth the amounts that Victor and Steven Posner should be required to disgorge:

**VICTOR POSNER**

| Year | Fischbach Compensation |
|---|---|
| 1987 | $ 875,000 |
| 1988 | 628,000 |
| 1989 | 475,000 |
| 1990 | $ 277,000 |
| TOTAL COMPENSATION | $2,255,000 |
| PREJUDGMENT INTEREST | $1,235,550 |
| **TOTAL OWED** | **$3,490,550** |

**STEVEN POSNER**

| Year | Fischbach Compensation |
|---|---|
| 1988 | $100,000 |
| 1989 | 100,000 |
| 1990 | $ 62,000 |
| TOTAL COMPENSATION | $262,000 |
| PREJUDGMENT INTEREST | $111,460 |
| **TOTAL OWED** | **$373,460** |

| DEFENDANTS' TOTAL DISGORGE-MENT OBLIGATION | $3,864,010[8] |
|---|---|

█ 92. This Court's award of prejudgment interest on disgorgement for the Posners' violations of the federal securities laws is a proper exercise of judicial discretion. *See Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 86 (2d Cir.1980); *Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied sub nom. Muscat v. Norte & Co.*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970). The award of prejudgment interest, like an award of disgorgement, deprives the Posners of their ill-gotten gains and prevents unjust enrichment. *See SEC v. Stephenson*, 732 F.Supp. 438, 439 (S.D.N.Y.1990). The Posners' personal wrongdoing justifies an award of interest in accord with the doctrine of fundamental fairness. *See Norte & Co.*, 416 F.2d at 1191; *SEC v. Tome*, 638 F.Supp. 638, 639 (S.D.N.Y.1986), *aff'd*, 833 F.2d 1086 (2d Cir.1987), *cert. denied sub nom. Transat-*

---

**8.** The compensation figures are taken from Schedules 14D–9 filed by Fischbach. [Ex. 70.] Prejudgment interest is calculated through June 30, 1993, and is based on the standard rates used by the Commission and accepted by courts. The rates are derived from IRS underpayment of taxes rates. Courts have awarded the Commission prejudgment interest calculated using the interest rates established quarterly by the Internal Revenue Service for money owed to the United States Treasury. *See SEC v. Bilzerian*, C.A. No. 89–1854 (SSH) 1993 WL 542584 (D.D.C. June 25, 1993) (final judgment ordering $29.2 million in prejudgment interest); *SEC v. Latin Investment Corp.*, C.A. No. 90–3101 (GAG) 1992 WL 551425 (D.D.C. June 29, 1992) (final judgment of permanent injunction); *SEC v. Allure Cosmetics, Ltd.*, No. 90 Civ. 2673 (NHP) (D.N.J. May 27, 1992) (final judgment of permanent injunction); *SEC v. Weinstein*, Civ. No. 90–4276 (ALJ, Jr.) (D.N.J. July 6, 1992) (final judgment of permanent injunction); *SEC v. Profit Enterprises, Inc., et al.*, C.A. No. 90–2020 1993 WL 534230 (D.D.C. May 10, 1993).

*lantic Fin. Co., S.A. v. SEC,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). In the context of section 10(b) and Rule 10b–5 actions, proof of the Posners' scienter is sufficient to justify an award of prejudgment interest. *See SEC v. Musella,* 748 F.Supp. 1028, 1043 (S.D.N.Y.1989), *aff'd,* 898 F.2d 138 (2d Cir.), *cert. denied sub nom. DeAngelis v. SEC,* 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). *See also Rolf v. Blyth, Eastman Dillon & Co.,* 637 F.2d at 86–87.

### V. *ADDITIONAL ANCILLARY RELIEF IS NEEDED TO ENSURE THE POSNERS' COMPLIANCE WITH THE INJUNCTION*

93. The injunctions that have previously been entered against the Posners have been notably ineffectual in preventing them from engaging in securities law violations. As the evidence in this case graphically demonstrates, the Posners have continued despite those injunctions to abuse their control positions in public companies to violate the federal securities laws. While, as discussed above, injunctive relief is surely warranted here, it would serve little purpose for the Court to issue yet another injunction against such recidivist violators without at the same time granting ancillary relief calculated to ensure that, this time, they comply with the Court's mandate. Accordingly the Court will also bar the Posners from serving as officers and directors of any reporting company, and shall order that the stock they own in corporations under their control be placed in voting trusts so as to divest them of control of those companies without divesting them of the economic value of their stock.

#### A. *Officer and Director Bar*
#### 1. **Sources of Authority**

94. As part of the Securities Law Enforcement Remedies Act of 1990 ("Remedies Act"), Congress codified the inherent authority of the federal courts—which had theretofore been recognized and exercised by the courts—to issue orders in appropriate circumstances barring individuals from acting as officers or directors of public companies. Securities Act § 20(e), 15 U.S.C. § 77t(e); Exchange Act § 21(d)(2), 15 U.S.C.

§ 78u(d)(2); S.Rep. No. 337, 101st Cong., 2d Sess. 22 (1990) (cited hereinafter as "Report"). As enacted, section 21(d)(2) of the Exchange Act provides that the court may impose such a bar in an SEC enforcement action on any person who has violated section 10(b) of the Exchange Act and whose "conduct demonstrates substantial unfitness to serve as an officer or director." Congress' express purpose in empowering the federal courts to issue such bars was to "combat recidivism and protect investors" and to "strengthen the remedial effect of the SEC's enforcement program." Report at 1, 2.

95. In reporting the Remedies Act out to the full Senate, the Senate Banking Committee observed that a "permanent bar might be appropriate if the violation were particularly egregious or the violator was a recidivist." Report at 21. It further observed that the remedy "is especially appropriate in cases in which a defendant has engaged in fraudulent conduct while serving in a corporate or other fiduciary capacity." *Id.* at 22. Responding to comments that corporate governance is generally left to regulation by the states, the Committee noted that "public shareholders may lack sufficient control to remove securities law violators from office or otherwise protect their own interests" and that, "[m]oreover, broader public concerns are involved when the actions of the violator undermine the integrity of the markets." *Id.*

96. Contrary to the defendants' contention, it is clear from the language of the statute and its legislative history that the officer and director bar provision may be applied retroactively in cases like this in which the conduct giving rise to it occurred before the effective date of the statute. First, as the legislative history recognizes, the Remedies Act merely codified authority the courts already possessed and exercised. Secondly, section 1(c) of the Remedies Act provides that the amendments made by the Act "shall be effective upon enactment," excepting only money penalties—which cannot be imposed for conduct occurring before the date of enactment—and several other provisions, not relevant here, pertaining to penny stock reform. Pub.L. No. 101–429 § 1(c), 104 Stat. 931 § 1(c) (1990). Thus, by nega-

tive implication, the statute itself shows that Congress intended the officer and director bar to be available as a remedy for conduct occurring before as well as after enactment of the statute.

97. Independent of the statute, the Court has authority pursuant to its general equitable powers to order the relief requested by the SEC. *See, e.g., Manor Nursing Centers*, 458 F.2d at 1103 ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy"); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir.1980) ("power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws"). *See also* Report at 22 (independent of statute, district courts already have wide latitude to grant ancillary relief, including "bar[ring] a person from serving as officer or director of a company").

### 2. Evidentiary Matters Relating to Ancillary Relief

■ 98. The reports of the court-appointed directors of DWG, which form part of the basis for the Court's conclusion that an officer-and-director bar is warranted here, are properly admitted in evidence as official reports under Federal Rule of Evidence 803(8). That rule provides in pertinent part that the following are not excluded by the hearsay rule:

> ... reports ... of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report
>
> ..., or (C) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The reports of the court-appointed directors of DWG "set[ ] forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report" and thus fit within the description of Rule 803(8)(B). The reports also fit within the description of Rule 803(8)(C) in that they "set[ ] forth ...

factual findings resulting from an investigation made pursuant to authority granted by law." The rationale for the exception to the hearsay rule embodied in Rule 803(8) is that a duty imposed by law to investigate and report carries with it a guaranty of reliability. *See, e.g.,* 4 *Weinstein's Evidence* ¶ 803(8)[03] (1992 ed. & Supp.1993); Michael H. Graham, *Federal Practice and Procedure: Evidence* § 6759 (interim ed. 1992 & Supp. 1993). Although the court-appointed directors do not constitute a traditional "public office or agency," their reports nonetheless carry the same guaranties of trustworthiness as those expressly contemplated by the rule and should be admitted on the same basis. Alternatively they may be admitted under the residual exception set forth in Rule 803(24).

99. The Court can and does infer from the Posners' declining to testify on matters pertaining to the officer and director bar that their truthful testimony would have been unfavorable to them. *See, e.g., United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir.1988) (when party fails to produce witness whose testimony would elucidate the transaction there is an inference that testimony would be unfavorable); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78, 80–81 (2d Cir.1961), *cert. denied*, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962) (in affirming SEC order revoking broker-dealer registration, court observed that respondent's failure to testify was "significant," and that "accepted rule is that failure to explain facts and circumstances warrants the inference that his testimony would have been adverse"); *Koufakis v. Carvel*, 425 F.2d 892, 902 (2d Cir.1970); *United States v. Priola*, 272 F.2d 589, 594 n. 10 (5th Cir.1959); John W. Strong, *McCormick on Evidence* § 295 at 288 (4th ed. 1992).

### 3. The Evidence Presented at Trial Compels the Conclusion that Victor and Steven Posner Should Be Barred from Serving as Officers and Directors of Any Reporting Companies

100. In view of the express language of the statute and the legislative history, one would be hard-pressed to find more worthy candidates to be barred from serving as offi-

cers and directors than the Posners. The evidence presented at trial regarding the Posners' fitness to serve as officers and directors—the findings in the Sharon Steel bankruptcy proceedings, Harold Kelley's testimony and the reports of the court-appointed directors of DWG, the violations proved in this case, the alleged violations on which the consent judgments were based in prior SEC actions—proves beyond any serious doubt that the Posners are contemptuous of the interests of public shareholders and willing to subordinate those interests to their own seemingly insatiable appetites. That evidence is particularly damning when viewed in light of the Posners' expressly declining to testify at trial regarding any of these matters.

101. All of the other factors recited in the legislative history of the Remedies Act confirm that permanent and unqualified bars are amply warranted here:

- As found above, the Posners' violations were egregious.
- The Posners are recidivists.
- They have engaged in fraudulent conduct in their corporate capacities.
- Because they typically hold a controlling interest in companies of which they have been officers and directors, the "public shareholders ... lack sufficient control to remove [them] from office or otherwise protect their own interests."
- "[B]roader public concerns are involved" here because the Posners' actions have made a mockery of the public policy underlying the various reporting and antifraud provisions they violated and have thereby served to "undermine the integrity of the markets."

102. Barring the Posners from acting as officers and directors of public companies would, in short, serve precisely the purposes intended by Congress in codifying the courts' authority to grant such relief.

### B. *Voting Trust to Divest the Posners of Control*

103. Because the Posners own controlling interests in public companies of which they are officers and directors, an order barring

them from serving in those capacities will not necessarily prevent them from using such companies as vehicles for future violations. Placing the shares they own in such companies in a voting trust will divest them of control, and thereby give added assurance of compliance, without depriving them of the economic value of their shares.

104. Courts have recognized on numerous occasions "that equitable relief may be granted to deprive those enjoined from future securities violations of the opportunity to continue in control of a corporation." *SEC v. Data Access Systems, Inc.*, [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,779, 1982 WL 1323 (D.N.J. Aug. 17, 1982) (rejecting defendant's argument that placing his stock in voting trust was punitive rather than remedial). In *SEC v. Bowler*, 427 F.2d 190 (4th Cir.1970), the district court enjoined the defendants from engaging in violations of the registration and antifraud provisions of the Securities Act of 1933 but declined the SEC's request for the appointment of a receiver for the corporate defendants. Like the Posners, the defendant in that case "and his family exercised their control over the corporate defendants for their own purposes." *Id.* at 194. Like the public companies the Posners have controlled, the defendant corporations in *Bowler* "had been the target of fraud, mismanagement and gross abuses of trust and ... had been used as vehicles for the private purposes of the individual defendants." *Id.* at 197. On appeal, the court held it was error for the district court *not* to divest the defendants of control of a corporation whose public shareholders they had defrauded, and remanded the case with instructions to place the corporation in receivership. *Id.* at 198. Similarly in *SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir.1963), the court affirmed the appointment of a trustee-receiver as a means of ousting from control defendants who had engaged in fraud and mismanagement. In reaching that result, the court stated, "It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control." *Id.* at 403.

105. The relatively milder remedy of a voting trust has been employed in a number

of cases to achieve the same end as the receiverships imposed in *Bowler* and *Keller*. *See, e.g., SEC v. Aminex Resources Corp.*, SEC Lit.Rel. No. 8426, 1978 WL 21007, 1978 SEC Lexis 1433 (D.D.C. June 1, 1978) (consent judgment); *SEC v. American Commonwealth Financial Corp.*, SEC Lit.Rel. No. 7920, 1977 WL 21060, 1977 SEC Lexis 1771 (N.D.Tex. May 12, 1977) (consent judgment). The consent judgments in *SEC v. Emersons Ltd.*, SEC Lit.Rel. No. 7392, 1976 WL 20375, 1976 SEC Lexis 1696 (D.D.C. May 11, 1976), and *SEC v. Eastern Freight Ways, Inc.*, SEC Lit.Rel. No. 7318, 1976 WL 19885, 1976 SEC Lexis 2139 (D.D.C. March 18, 1976), coupled voting trusts with officer and director bars. Other types of restraints on the voting of securities by specified defendants have also been imposed. *See, e.g., SEC v. WITS, Inc.*, SEC Lit.Rel. No. 8436, 1978 WL 19207, 1978 SEC Lexis 1333 (W.D.Wash. June 20, 1978) (restricting ability to vote shares of officers alleged to have used corporate assets for their own benefit without disclosure); *SEC v. Inflight Services, Inc.*, SEC Lit.Rel. No. 8182, 1977 SEC Lexis 463 (S.D.N.Y. Nov. 3, 1977) (restricting ability to vote shares and barring defendants from becoming officer or director of any public company); *SEC v. Potter Instrument Co., Inc.*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,924 (D.D.C. March 9, 1977) (executive who was alleged to have received substantial undisclosed personal benefits in addition to salary prohibited from voting shares against recommendation of board).

106. Accordingly, in addition to barring the Posners from serving as officers or directors of any reporting company, the Court will order that the stock that either of them owns, directly or indirectly, in any reporting company they control (as that term is defined in Exchange Act Rule 12b–2, 17 C.F.R. § 240.12b–2), be placed in a voting trust. The terms of the trust and the trustee will be subject to the SEC's approval. The order will operate prospectively so as to ensure that its terms are not frustrated by the Posners gaining control of a company which they do not control as of the date of the order. The order will expressly provide that the Posners retain the right to sell or pledge the stock held in the trust at any time; that they

may buy more stock in companies they control so long as it is placed in the voting trust; and that their right to vote stock they own in a company they control shall be restored upon that company's ceasing to be a reporting company under the federal securities laws.

\*       \*       \*       \*       \*       \*

The foregoing Supplemental Findings of Fact and Conclusions of Law together with the Court's Opinion and partial Findings therein, filed herewith, shall constitute the Findings and Conclusions required by Rule 52(a) of the Federal Rules of Civil Procedure.

Submit a Decree accordingly on 10 days' notice.

SO ORDERED.